UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| DILIGENT CORPORATION and DILIGENT BOARDBOOKS LIMITED,<br><br>Plaintiffs,<br><br>v.<br><br>KUBERNO LIMITED, KUBERNO US INC., and Mr. ANDREW HARKER-RIGAL, an individual,<br><br>Defendants. | Case No. 1:25-cv-01733-ALC<br><br>Hon. Andrew L. Carter, Jr. |

**MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS BY**
**DEFENDANTS KUBERNO LIMITED AND KUBERNO US INC.**


COVINGTON & BURLING LLP
The New York Times Building
620 Eighth Avenue
New York, NY 10018-1405

-and-

One CityCenter
850 10th Street, NW
Washington, DC 20001-4956

*Counsel for Defendants Kuberno Limited and Kuberno US Inc.*

## TABLE OF CONTENTS

INTRODUCTION ........................................................................................................ 1

BACKGROUND ........................................................................................................ 3

ARGUMENT ........................................................................................................ 8

I. The Doctrine of *Forum Non Conveniens* Warrants Dismissal of this Action. .................. 9

A. Plaintiffs' Choice of Forum Should Be Accorded Little or No Deference........... 10

B. The UK is an Available Alternative Forum. ........................................................ 14

C. Private and Public Interest Factors Call for an English Court to Hear this Case. ........................................................................................................ 16

1. Private Interest Factors Favor Litigating in England. ............................... 16
2. Public Interest Factors Also Favor Litigating in England. ....................... 18

II. Plaintiffs Fail to State a Claim for Misappropriation of Trade Secrets. ........................... 20

CONCLUSION ........................................................................................................ 23

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Aguinda v. Texaco, Inc.*,
303 F.3d 470 (2d Cir. 2002)....................18

*Allstate Life Ins. Co. v. Linter Grp. Ltd.*,
994 F.2d 996 (2d. Cir. 1993)....................17

*Banculescu v. Compania Sud Americana De Vapores, SA*,
2012 WL 5909696 (S.D.N.Y. Nov. 26, 2012) (Carter, J.).................... *passim*

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007)....................20

*BMR & Associates, LLP v. SFW Capital Partners, LLC*,
92 F. Supp. 3d 128 (S.D.N.Y. 2015)....................9, 10, 13

*Capital Currency Exch., N.V. v. Nat'l Westminster Bank PLC*,
155 F.3d 603 (2d Cir. 1998)....................17

*Celestin v. Caribbean Air Mail, Inc.*,
30 F.4th 133 (2d Cir. 2022) ....................9

*Democratic Nat'l Comm. v. Russian Fed.*,
392 F. Supp. 3d 410 (S.D.N.Y. 2019)....................20

*Do Rosario Veiga v. World Meteorological Org.*,
486 F. Supp. 2d 297 (S.D.N.Y. 2007)....................12

*Lazare Kaplan Int'l Inc. v. KBC Bank N.V.*,
337 F. Supp. 3d 274 (S.D.N.Y. 2018) (Carter, J.), *aff'd*, 785 F. App'x 18 (2d Cir. 2019) .................... *passim*

*Lehman v. Dow Jones & Co., Inc.*,
783 F.2d 285 (2d Cir. 1986)....................21

*Marchante v. Reuters Am. LLC*,
736 F. Supp. 3d 209 (S.D.N.Y. 2024)....................14

*Negative, Inc. v. McNamara*,
770 F. Supp. 3d 472 (E.D.N.Y. 2025) ....................20

*Norex Petroleum Ltd. v. Access Indus., Inc.*,
416 F.3d 146 (2d Cir. 2005)....................15

*Pauwels v. Deloitte LLP*,
83 F.4th 171 (2d Cir. 2023) ....................................................................................21

*Pollux Holding Ltd. v. Chase Manhattan Bank*,
329 F.3d 64 (2d Cir. 2003).......................................................................................15

*Star Colbert v. Dougan*,
724 F. Supp. 3d 304 (S.D.N.Y. 2024)...................................................................*passim*

*Strategic Value Master Fund, Ltd. V. Cargill Fin. Servs., Corp.*,
421 F. Supp. 2d 741 (S.D.N.Y. 2006)........................................................................18

*Zabit v. Brandometry, LLC*,
540 F. Supp. 3d 412 (S.D.N.Y. 2021)...................................................................21, 22

**Statutes**

18 U.S.C. § 1839(3) ...........................................................................................20

28 U.S.C. § 1783 .................................................................................................17

**Other Authorities**

Federal Rules of Civil Procedure Rule 12(b)(6) ....................................................8, 20

Federal Rules of Civil Procedure Rule 38 ...............................................................19

Federal Rules of Civil Procedure Rule 45(b).............................................................17

## INTRODUCTION

If this case belongs anywhere, it would be in an English—not a US—court. Indeed, Plaintiff Diligent Boardbooks Limited, a UK-based company ("DBL"), spent three months between April and June 2024 threatening to file English law claims in English court concerning the same set of alleged circumstances that underlie this lawsuit that was improperly filed here eight months later in February 2025. This is textbook forum-shopping in an effort to avoid the English Rule where the losing party has to pay the prevailing party's legal fees. This appears to be part of an underhanded strategy in which DBL seeks to bully out of the marketplace an upstart UK-based company, Defendant Kuberno Limited, by attempting to force it to litigate in a wholly inconvenient forum where it would have to be responsible for its own attorneys' fees even if it were to prevail in defending against Plaintiffs' meritless case.

Indeed, from the very start, DBL treated this matter as an English law dispute between two UK-based entities regarding alleged conduct by a UK resident, Defendant Andrew Harker-Rigal, during the time he was employed by Kuberno Limited in the UK. In April 2024, UK-based counsel for DBL sent a letter to Kuberno Limited alleging purported contract-based claims against Harker-Rigal and Kuberno Limited under English law. The purported English law claims arose from Harker-Rigal's alleged continued access to DBL's demonstration site (which purportedly contains confidential DBL data that it shares with prospective customers for marketing purposes) over a period of two years after his employment at DBL ended. DBL alleged that Harker-Rigal—using his DBL login credentials that DBL never disabled—accessed DBL's confidential information and disclosed such information to Kuberno Limited, in violation of his employment agreement with DBL. In turn, DBL alleges that Kuberno Limited purportedly used such information to compete with DBL's products and divert some of DBL's customers to Kuberno Limited. After Kuberno Limited's last correspondence on July 19, 2024—through which Kuberno Limited thoroughly

refuted DBL's allegations and noted that DBL was attempting to stifle legitimate competition in the industry by publicly making false accusations against Kuberno—DBL ceased further communications about this matter. Kuberno Limited therefore reasonably believed that the matter had been resolved.

Unfortunately, seven months later, Plaintiffs Diligent Corporation and Diligent Boardbooks Limited (collectively, "Plaintiffs") decided to burden the Court with this dispute. Despite the fact that DBL's letters in 2024 solely contemplated bringing English law claims before English courts, Plaintiffs now argue in this action that the dispute purportedly has ties to New York—primarily through the belated, improper tactical inclusion of Plaintiff Diligent Corporation and Defendant Kuberno US Inc. Given that Diligent Corporation did not employ Harker-Rigal or even own the alleged trade secrets at issue, there was no reason to include Diligent Corporation as a party other than for the purpose of forum shopping to litigate this case in the United States—to which this dispute has no meaningful connection. Likewise, Kuberno US Inc. (which did not exist until January 2024) never employed Harker-Rigal and was not once mentioned in the letter-writing campaign in 2024.

The Court should not countenance Plaintiffs' transparent forum-shopping tactics. Instead, the Court should dismiss this action under the doctrine of *forum non conveniens* without deferring to Plaintiffs' choice of forum. English courts are highly regarded by US courts and provide an available and adequate alternative forum for hearing this case, and private and public interest factors strongly favor litigating in England. To be clear, Kuberno strongly denies Plaintiffs' allegations and claims, which are designed to undermine Kuberno's business following Kuberno's penetration of the market through fair competition and the successful development of its product, called Kube. But if this matter is to be litigated at all then it should be before an English court.

Alternatively, the Court should dismiss Plaintiffs' trade secret misappropriation claims under the Defend Trade Secrets Act and New York common law against Kuberno Limited and Kuberno US Inc. because Plaintiffs have failed to state a claim by not sufficiently pleading the existence of trade secrets. Specifically, Plaintiffs' own admissions in the Complaint that Harker-Rigal was able to access purported trade secrets through his historical login credentials reveal that Plaintiffs did not take reasonable measures to safeguard the secrecy of their alleged trade secrets and thus they cannot state a claim for trade secret misappropriation. DBL's contention that it stored trade secrets in a demonstration site accessible to prospective customers and former employees such as Harker-Rigal defies the definition of what qualifies as a trade secret. If trade secrets were actually at issue, Plaintiffs would have immediately brought suit in English court when they first discovered the alleged misconduct over a year ago. Instead, DBL did nothing more but send two letters between April and June 2024 alleging that purportedly confidential information (not trade secrets) had been accessed. And yet, Plaintiffs ***still declined to pursue the matter further for another eight months*** until filing the Complaint at the end of February 2025—nearly a year after first writing to Kuberno Limited about Harker-Rigal's alleged conduct. Such conduct (or lack thereof) further demonstrates the bad faith nature of Plaintiffs' decision to belatedly initiate a lawsuit in the United States.

## BACKGROUND

### A. The Parties

Defendant Kuberno Limited is a leading global legal entity management software provider that was founded in 2020 and created a cutting-edge legal entity management platform—called Kube—which provides a single source of trusted entity data for global organizations and is sold to customers worldwide. Dkt. 1 (the "Complaint" or "Compl.") ¶ 4. Kuberno Limited is headquartered and has its principal place of business in the UK, and Defendant Kuberno US Inc.

is a Delaware corporation that was incorporated in January 2024. *Id.* ¶¶ 16-17. Although they are separate entities, the Complaint refers to DBL and Diligent Corporation collectively as "Diligent" and refers to Kuberno Limited and Kuberno US Inc. collectively as "Kuberno." *See, e.g.*, Compl. ¶¶ 1-4.

Plaintiff Diligent Boardbooks Limited is a UK company and Plaintiff Diligent Corporation is a Delaware corporation with its principal place of business in New York City. Compl. ¶¶ 13-15. Defendant Andrew Harker-Rigal is a UK citizen and resident, including when he worked for DBL and for Kuberno Limited. Dkt. 24-3, Declaration of Andrew Harker-Rigal ("Harker-Rigal Decl.") ¶ 3; Compl. ¶ 18.

Harker-Rigal was employed by DBL from "at least 2017, where he rose to the rank of Regional Sales Director III until his departure on or around February 2021." Compl. ¶ 45. According to his employment agreement with DBL, Harker-Rigal's normal place of work was in London and the employment agreement was governed by the "laws of England and the parties submit to the exclusive jurisdiction of the English courts." Harker-Rigal Decl. ¶ 10. Following the end of his employment at DBL in February 2021, Harker-Rigal was self-employed until May 2022, when he began working with Kuberno Limited as a contractor on a part-time basis. *Id.* ¶ 19. Harker-Rigal became a full-time employee of Kuberno Limited in July 2023 until January 2025. Harker-Rigal Decl. ¶¶ 19-21. Throughout his employment with Kuberno Limited, Harker-Rigal performed all of his work from the UK. *Id.* ¶ 20.

**B. Letters Between UK Entities Concerning English Law**

On April 22, 2024, DBL's UK-based counsel, Withers LLP, sent a letter directed to Kuberno Limited with the subject line of "Unathorized [sic] use and access of proprietary intellectual property and confidential information, etc." ("April 2024 Letter"). Declaration of

Antony Russel Craggs ("Craggs Decl."), Ex. B. This letter was sent "in accordance with the Practice Direction on Pre-Action Conduct and Protocols (the 'Pre-action PD') contained in the English Civil Procedure Rules." *Id.* ¶ 2. Through this letter, DBL argued that Harker-Rigal "possesses Confidential Information (as defined in Mr Harker-Rigal's Diligent employment contract) and Proprietary Material (as defined below) which he and/or Kuberno have misused, and/or are continuing to misuse." *Id.* ¶ 3. According to the letter, Harker-Rigal focused on sales of Diligent Entities (which is a Diligent software platform) when he was employed at DBL and was provided with access to a demonstration version of Diligent Entities ("Demo Site") for purposes of marketing to prospective customers. *Id.* ¶ 9. DBL alleged that Harker-Rigal continued to access the Demo Site between October 27, 2021 (at which time he was performing sales management services for others as a contractor, Harker-Rigal Decl. ¶ 19, and more than a year before he became an employee of Kuberno Limited) and March 19, 2024 using his historic credentials from the time of his employment at Diligent, among other allegations. *Id.* ¶ 12.

Notably, the April 2024 Letter purports to set forth certain "causes of action" under English law that DBL may assert against Kuberno Limited in connection with Harker-Rigal's alleged activities, including the following statements:

- "[O]ur client may have grounds to bring proceedings against Kuberno, Mr Harker-Rigal and any other Kuberno individuals involved in the wrongdoings alleged above in unlawful means conspiracy."
- "Diligent may have a claim against Kuberno directly for procuring Mr Harker-Rigal's breach of contract."
- "Diligent is entitled to commence legal proceedings against Kuberno for copyright infringement and reserves its right to do so."

Craggs Decl., Ex. B ¶¶ 23-26.

Notably, the April 2024 Letter **did not** allege that any of the Confidential Information that was purportedly accessed by Harker-Rigal constituted trade secret information. In fact, the April 2024 Letter contains no allegations concerning misappropriation of trade secrets and does not suggest that there was any data or information in the Demo Site that constitutes a trade secret.

In response to the April 2024 Letter, Kuberno Limited's UK-based counsel, Shoosmiths LLP, noted that Kuberno Limited "did not induce any access to the Demo Site" and that its understanding from Harker-Rigal was that the "Demo Site served as a platform solely intended for the purposes of demonstrating the functionality of Diligent Entries and therefore did not contain live data relating to Diligent customers or sales data." Craggs Decl., Ex. D ¶ 16. Kuberno Limited further noted that "it is surprising that Mr Harker-Rigal's log-on credentials for the Demo Site remained active, apparently for over two years after his employment with Diligent ended." *Id.* ¶ 17. Through this letter, Kuberno Limited also directly refuted all allegations in the April 2024 Letter concerning the Kube product and Kuberno Limited's successful business development efforts. *Id.* ¶¶ 4-22.

DBL responded on June 14, 2024, acknowledging that DBL inexplicably "omitted in error to revoke Mr Harker Rigal's access to the Demo Site" and claiming that (among other things) "when accessing the Demo Site, Mr Harker-Rigal was acting as an agent for Kuberno" and that "[b]oth parties are liable for breach of confidence." Craggs Decl., Ex. E ¶¶ 21 & 28. In addition, the letter contained an extensive list of undertakings that DBL demanded of Kuberno Limited and threatened to "seek injunctive relief against your client without further notice." *Id.* ¶ 35. DBL also purported to "reserve the right to make an application for early disclosure as part of any injunction application or make an application for pre-action disclosure based on CPR r. 31.16." *Id.* ¶ 36.

On July 19, 2024, Kuberno Limited, once again through its UK counsel, provided a detailed rebuttal of the allegations set forth in DBL's June 14 letter. Citing publicly available information about Diligent Entities and relevant English law, Kuberno Limited pointed out that the Demo Site did not appear to contain any confidential information and that, in any event, Kuberno did not use any confidential information belonging to DBL. Craggs Decl., Ex. F ¶¶ 5-9. Kuberno Limited further reiterated that Harker-Rigal's continued access to the Demo Site after his employment with DBL ended "is inconsistent with [DBL] considering [the data in the Demo Site] to be commercially sensitive" especially because it appears that his access "was via single sign on" which "is not adequate security by Diligent for confidential information." *Id.* ¶ 18. (Single Sign-On, which allows individuals and organizations to use a single username and password to access multiple resources, poses a security risk given the credentials' vulnerability to being compromised.)

Notably, Kuberno Limited provided assurances that (i) it "has created a unique product which intentionally distinguishes itself from other entity management systems in the industry" including Diligent Entities (*id.* ¶ 22); and (ii) "if any information on the Demo Site were confidential, it has not been copied in the Kube functionality" (*id.* ¶ 26). Kuberno Limited also expressed its concern that DBL "is continuing to exploit the relative size of Diligent's business to Kuberno's and that this correspondence is being used to stifle competition in the industry. [DBL] is not entitled to abuse their market dominance by threatening a smaller disrupter in the industry where no legitimate similarities between the products can be demonstrated and where [its] actions appear to simply be a tactic to restrict market entry and harm competition." *Id.* ¶ 24. For these reasons, Kuberno Limited conveyed that it would "not indulge the allegations any further." *Id.* ¶ 27.

DBL did not respond to Kuberno Limited's July 19 letter nor pursue any action against Kuberno Limited under English law or through the English judicial system. Kuberno Limited was therefore shocked when Plaintiffs—after seven months of radio silence on this issue following Kuberno Limited's July 19 letter—filed this action on February 28, 2025.

According to the Complaint, Harker-Rigal allegedly accessed the Demo Site while he was working in the UK for Kuberno Limited to gain "insight into Entities' confidential features and functionalities" for Kuberno's benefit. Compl. ¶ 58. Plaintiffs acknowledge that Harker-Rigal used the same "Diligent credentials" that he obtained while he was employed by DBL to access the Demo Site. *Id.* ¶ 54. Plaintiffs further assert that "all the Defendants misused (and continue to misuse) the Diligent trade secrets they obtained through the unauthorized access of Diligent Corporation's computer systems and servers." *Id.* ¶ 60. Although Plaintiffs allege that they "suffered and will continue to suffer irreparable harm," *id.* ¶¶ 75, 88 & 108, they did not seek a temporary restraining order—which further calls into question the extent to which the Demo Site even contains confidential information and Plaintiffs' actual motives for bringing this lawsuit before this Court (as opposed to an English court in 2024).

## ARGUMENT

The Court should dismiss the Complaint under the doctrine of *forum non conveniens* because England is the proper forum for adjudicating this dispute. Alternatively, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, the Court should dismiss Plaintiffs' misappropriation of trade secrets claims under the Defend Trade Secrets Act ("DTSA") and under New York common law (Counts I and II) for failure to state a claim upon which relief can be granted.

## I. **The Doctrine of *Forum Non Conveniens* Warrants Dismissal of this Action.**

The doctrine of *forum non conveniens* empowers a court to "dismiss a claim even if the court is a permissible venue with proper jurisdiction over the claim. 'The central purpose of a *forum non conveniens* inquiry is to determine where trial will be most convenient and will serve the ends of justice.'" *Star Colbert v. Dougan*, 724 F. Supp. 3d 304, 318-19 (S.D.N.Y. 2024) (internal citations omitted). "There are three steps to the *forum non conveniens* inquiry: (1) 'determine[ ] the degree of deference properly accorded the plaintiff's choice of forum'; (2) 'consider[ ] whether the alternative forum proposed by the defendants is adequate to adjudicate the parties' dispute'; and (3) 'balance[ ] the private and public interests implicated in the choice of forum.'" *Celestin v. Caribbean Air Mail, Inc.*, 30 F.4th 133, 145 (2d Cir. 2022) (citing *Norex Petroleum Ltd. v. Access Indus., Inc.*, 416 F.3d 146, 153 (2d Cir. 2005)). Courts review each prong of the *forum non conveniens* test in turn to determine which forum would ultimately be the most convenient for litigation of the matter. *BMR & Associates, LLP v. SFW Capital Partners, LLC*, 92 F. Supp. 3d 128, 139 (S.D.N.Y. 2015).

Courts in the Second Circuit, including this Court, have dismissed cases on *forum non conveniens* grounds under circumstances similar to those present here. *See, e.g.*, *Banculescu v. Compania Sud Americana De Vapores, SA*, 2012 WL 5909696, at *6 (S.D.N.Y. Nov. 26, 2012) (Carter, J.) (dismissing a Romanian plaintiff's complaint where "[t]he substantive issues and conduct have a greater relation to Romania and Germany than the United States" and potential witnesses were outside the United States); *Lazare Kaplan Int'l Inc. v. KBC Bank N.V.*, 337 F. Supp. 3d 274, 297-98 (S.D.N.Y. 2018) (Carter, J.), *aff'd*, 785 F. App'x 18 (2d Cir. 2019) (holding that dismissal was warranted where plaintiff was a US company with its headquarters in New York, while defendants were Belgian bank corporations that had offices in New York; although "[s]ome alleged unlawful conduct is connected to the United States" in the form of transactions

made through New York-based accounts, "the brunt of the alleged conduct took place outside of the United States" and thus "this case's connection to New York is peripheral").[1]

For the reasons set forth below, this dispute should be heard, if at all, by an English court.

**A. Plaintiffs' Choice of Forum Should Be Accorded Little or No Deference.**

Despite the clear connections of the parties and this dispute to the UK (indeed DBL originally spent months in 2024 threatening to file suit in an English court), Plaintiffs chose to bring purported claims before this Court as an improper forum-shopping tactic to drive up defense costs. Although there is a presumption in favor of the plaintiff's choice of forum, the "Second Circuit has instructed that the amount of deference to be given to a plaintiff's choice of forum should be evaluated on a sliding scale. '[T]he greater the plaintiff's or the lawsuit's bona fide connection to the United States and to the forum of choice and the more it appears that considerations of convenience favor the conduct of the lawsuit in the United States,' the more deference should be afforded to the plaintiff's choice." *BMR & Associates, LLP*, 92 F. Supp. 3d at 139 (quoting *Iragorri v. United Tech. Corp.*, 274 F.3d 65, 72 (2d Cir. 2001)). But "'[w]hen the plaintiff is foreign, however, this assumption is much less reasonable. Because the central purpose of any forum non conveniens inquiry is to ensure that the trial is convenient, a foreign plaintiff's choice deserves less deference.'" *BMR & Associates, LLP*, 92 F. Supp. 3d at 139 (quoting *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 256 (1981)).

When evaluating the amount of deference that a plaintiff's choice of forum should receive, the court must consider factors including "'the convenience of the plaintiff's residence in relation

---

[1] *See also Star Colbert*, 724 F. Supp. 3d at 339 (holding that the parties should proceed in Switzerland where "the connection of this action with the United States is marginal at best in comparison to the magnitude of the factual and legal links of all material aspects of the dispute to Switzerland"); *BMR & Associates, LLP*, 92 F. Supp. 3d at 143 (holding that the majority of the factors weigh heavily in favor of litigation in India where the plaintiffs were based in India and had little connection to New York).

to the chosen forum, the availability of witnesses or evidence to the forum district, the defendant's amenability to suit in the forum district, the availability of appropriate legal assistance, and other reasons relating to convenience or expense.'" *Star Colbert*, 724 F. Supp. 3d at 319 (quoting *Iragorri v. United Tech. Corp.*, 274 F.3d 65, 71 (2d Cir. 2001)).

DBL—the entity that employed Harker-Rigal and threatened to bring claims against Defendants under English law through letters sent by their UK counsel in 2024—is a UK company with no office in New York. Where, as here, "'a foreign plaintiff sues in a United States forum such choice is entitled to less deference because one may not easily presume that choice is convenient.'" *Star Colbert*, 724 F. Supp. 3d at 320 (citations omitted). Indeed, litigating in New York court would be much less convenient for DBL as compared to litigating in the UK. "Further, in the Second Circuit, deference to a plaintiff's choice of forum is diminished when the 'plaintiff is a corporation doing business abroad and can expect to litigate in foreign courts.'" *Id.* Because DBL and Diligent Corporation do business in the UK and around the world, they should expect to litigate claims in the UK. The Court should not defer to DBL's choice of a US forum where the appropriate forum is in DBL's home country.

Significantly, the pre-action letters that were exchanged by DBL's and Kuberno Limited's UK counsel reveal DBL's understanding that any dispute over Harker-Rigal's alleged actions would be governed by English law and adjudicated before an English court. Cragg Decl. ¶¶ 6-19. In fact, DBL informed both Harker-Rigal and Kuberno Limited that DBL considered Harker-Rigal's alleged conduct to constitute a breach of his employment agreement, which is "governed by laws of England and the parties submit to the exclusive jurisdiction of the English courts." Harker-Rigal Decl. ¶ 10 & Ex. A; *see also* Craggs Decl. ¶ 19.

Indeed, recognizing DBL's lack of connections to the United States, Diligent Corporation was improperly included as a party in this lawsuit in a transparent attempt for DBL to forum shop. Although Plaintiffs claim that Harker-Rigal accessed computer servers located in the United States and owned by Diligent Corporation, Compl. ¶ 6, the location of the computer servers is inconsequential given that the alleged misconduct by Harker-Rigal and Kuberno occurred in the UK. Diligent Corporation also does not even own the purported trade secrets that Harker-Rigal allegedly accessed through the Demo Site. Compl. ¶ 68 ("The trade secrets [] are owned by Diligent Boardbooks Limited and licensed to Diligent Corporation . . . ."). Given that the crux of this dispute concerns UK resident Harker-Rigal's alleged misappropriation of DBL's trade secrets for Kuberno's benefit, Diligent Corporation has little connection to this action.

The core issues and conduct have a much greater relation to the UK than to the United States. The claims arose from (i) actions allegedly taken by Harker-Rigal (while he was employed in the UK) with respect to the Demo Site for the supposed benefit of his former UK-based employer, Kuberno Limited, and (ii) Defendants' purported use of Plaintiffs' trade secret information to improve the Kube product and divert customers from Plaintiffs (which Kuberno denies). Minimal deference to Plaintiffs' choice of forum should be accorded because, "in relation to the core operative facts in dispute[,] the parties and events at best have only marginal links to the plaintiff's chosen venue." *Do Rosario Veiga v. World Meteorological Org.*, 486 F. Supp. 2d 297, 302 (S.D.N.Y. 2007). Indeed, the scant references to New York in the Complaint make clear that New York's role in this dispute is peripheral at best. *See* Compl. ¶ 22 (Defendants "committed the alleged tortious acts of trade secret misappropriation and unauthorized access to Diligent Corporation's servers *outside of New York*, causing injury to Diligent Corporation in New York.") (emphasis added)). Even assuming the truth of the allegations in the Complaint, any injuries

sustained by Diligent Corporation from sales of the Kube product to US customers do not mean that Plaintiffs' choice of New York was appropriate in light of this dispute's much stronger ties to the UK.

Tellingly, the 2024 letters between the parties' UK counsel demonstrate that DBL was primarily concerned about Harker-Rigal's potential access to and possession of "Confidential Information (as defined in Mr Harker-Rigal's Diligent employment contract)." Craggs Decl. ¶¶ 6-13. Nowhere in the letters did DBL claim that such purported "Confidential Information" constituted trade secrets. Accordingly, Plaintiffs' decision not to bring any breach of contract claim by DBL against Harker-Rigal or Kuberno Limited in order to avoid litigating this dispute in the UK (as required under the mandatory forum selection clause in Harker-Rigal's employment agreement) is strongly indicative of improper forum shopping.

Circumstances "'generally indicative of forum shopping,' include 'attempts to win a tactical advantage resulting from local laws that favor the plaintiff's case, the habitual generosity of juries in the United States or in the forum district, the plaintiff's popularity or the defendant's unpopularity in the region, or the inconvenience and expense to the defendant resulting from litigation in that forum.'" *Star Colbert*, 724 F. Supp. 3d at 319 (citations omitted). Here, Plaintiffs sought to win a tactical advantage by taking advantage of the American Rule and avoiding the English Rule, under which DBL would have to pay Kuberno's and Harker-Rigal's legal fees should it not prevail on its claims. Thus, the 2024 letters amount to a "smoking gun" showing that Plaintiffs were "clearly attempting to forum shop," *BMR & Associates, LLP*, 92 F. Supp. 3d at 139, or—at the very least—the letters show that "[a] plausible likelihood exists that a foreign plaintiff [DBL] select[ed] a U.S. forum for forum-shopping reasons," *Banculescu*, 2012 WL 5909696, at *5. *See also Lazare Kaplan Int'l Inc.*, 337 F. Supp. 3d at 297 ("'[T]he more it appears

that the plaintiff's choice of a U.S. forum was motivated by forum-shopping reasons . . . the less deference the plaintiff's choice commands.'" (citation omitted)).

For the above reasons, Plaintiffs' choice of this US forum warrants little or no deference.

### B. The UK is an Available Alternative Forum.

"[T]he Court's next step in the *forum non conveniens* inquiry is to determine the existence of a presently available alternative forum in which Plaintiffs can litigate their claim." *Star Colbert*, 724 F. Supp. 3d at 325 (citations omitted). "'An alternative forum is generally adequate if: (1) the defendants are subject to service of process there; and (2) the forum permits litigation of the subject matter of the dispute' 'and offers remedies for the wrongs the plaintiff alleges, even if the causes of action and relief provided there are not identical in every respect to the claims the plaintiff demands or redress he seeks in his chosen forum.'" *Id.* (citations omitted). Notably, the "putative alternative forum is not required to 'adequately address' U.S.-specific law, but instead must only cover 'the essential subject matter of the dispute.'" *Marchante v. Reuters Am. LLC*, 736 F. Supp. 3d 209, 218 (S.D.N.Y. 2024) (quoting *Aenergy, S.A. v. Republic of Angola*, 31 F.4th 119, 130-31 (2d Cir. 2022)).

With respect to the first factor, Harker-Rigal has confirmed his consent to service and jurisdiction in the UK for purposes of this case if the case is transferred to the UK. Harker-Rigal Decl. ¶ 34. Likewise, Kuberno Limited is headquartered and has its principal place of business in the UK, and is thus subject to the jurisdiction of English courts. Compl. ¶ 16. And, should this Court dismiss the Complaint based on *forum non conveniens* and Plaintiffs decide to bring their claims before an English court, then Kuberno US Inc. consents to service in England and submits to the jurisdiction of English courts solely for purposes of this case. Thus, the UK is an available alternative forum because, among other reasons, each Defendant is amenable to service in England

and consents to the jurisdiction of the English courts for purposes of this case. *See also* Craggs Decl. ¶ 70.

In evaluating the second factor (*i.e.*, the adequacy of the forum), courts often consider affidavits from lawyers or law experts from the alternative forum in determining whether the alternative forum is "adequate." *See, e.g.*, *Norex Petroleum Ltd. v. Access Industries, Inc.*, 416 F.3d 146, 158 (2d Cir. 2005); *Lazare Kaplan Int'l Inc.*, 337 F. Supp. 3d at 300; *Star Colbert*, 724 F. Supp. 3d at 326. Courts in the Second Circuit have "expressed high regard" for UK courts' "fairness and commitment to the rule of law." *Pollux Holding Ltd. v. Chase Manhattan Bank*, 329 F.3d 64, 75 (2d Cir. 2003) (holding that "it certainly cannot be said that it was an abuse of discretion to hold that England was an adequate alternative forum"). As explained in the accompanying Declaration of Antony Russel Craggs (who is a partner of the UK-based firm Shoosmiths LLP and specializes in intellectual property litigation before UK courts), English courts offer Plaintiffs similar avenues of relief for their claims. *See* Craggs Decl. ¶¶ 45-67.[2] Although the causes of action under English law are similar (though not identical) to the causes of action set forth in the Complaint, Plaintiffs may obtain monetary damages and injunctive relief for any purported misuse of confidential information or use of trade secrets.[3] *See id.* English courts

---

[2] "'[I]n the determination of a motion to dismiss for forum non conveniens, the court may consider affidavits submitted by the moving and opposing parties.'" *Banculescu*, 2012 WL 5909696, at *3 (citing *Base Metal Trading SA v. Russian Aluminum*, 253 F. Supp. 2d 681, 699 n. 13 (S.D.N.Y. 2003)).

[3] Although English courts might not recognize a claim styled specifically as "Violations of the Computer Fraud and Abuse Act" (Count III) or "unfair competition" (Count IV), "[t]he availability of an adequate alternative forum does not depend on the existence of the identical cause of action in the other forum, nor on identical remedies." *Lazare Kaplan Int'l Inc.*, 337 F. Supp. 3d at 299 (citing *Norex Petroleum Ltd.*, 416 F.3d at 158). In any event, as set forth in the Craggs Declaration, Diligent may seek relief for Kuberno's purported unfair competition through the English law cause of action for misuse of confidential information (Craggs Decl. ¶¶ 63-65) and English law provides for civil remedies for alleged misuse of computers (*id.* ¶¶ 66-67).

can also exercise jurisdiction over each of the parties to address the subject matter of this dispute. *Id.* ¶¶ 68-70.

Importantly, the 2024 letters from DBL's UK counsel to Kuberno Limited—in which DBL threatened to bring several claims under English law—reveal that DBL can (and knows that it can) obtain adequate relief from each Defendant through legal proceedings in the UK should Plaintiffs prevail on their claims. For these reasons, the UK is an adequate alternative forum for hearing this case.

### C. Private and Public Interest Factors Call for an English Court to Hear this Case.

"The third step in the *forum non conveniens* analysis is to weigh two sets of factors – the private interest factors and the public interest factors – to determine whether adjudication is more appropriate in the present forum or in an alternative forum." *Star Colbert*, 724 F. Supp. 3d at 329 (citations omitted). Both factors strongly favor dismissal of the present case.

#### 1. *Private Interest Factors Favor Litigating in England.*

The private interest factors are: "'(1) the relative ease of access to evidence; (2) the cost to transport witnesses to trial; (3) the availability of compulsory process for unwilling witnesses; and (4) other factors that make the trial more expeditious or less expensive.' These factors help the court balance 'the hardships defendant would suffer through the retention of jurisdiction and the hardships the plaintiff would suffer as the result of dismissal' and having to bring suit in another jurisdiction." *Banculescu*, 2012 WL 5909696, at *4 (citation omitted). Each of these private interest factors favors dismissal.

*First*, Plaintiffs' allegations that Harker-Rigal misappropriated trade secrets during his employment in the UK for Kuberno Limited make clear that the majority of relevant documents and witnesses for both parties are in the UK. Because the key witnesses are or were employed by

DBL and Kuberno Limited, English courts would be able to exercise jurisdiction over them and access evidence from them much more easily than would US courts. *See Star Colbert*, 724 F. Supp. 3d at 329-30; *Lazare Kaplan Int'l Inc.*, 337 F. Supp. 3d at 301. In addition, Diligent Corporation did not employ Harker-Rigal and Defendant Kuberno US Inc. was not even incorporated until January 2024, which is after much of the alleged misconduct by Harker-Rigal occurred. Accordingly, relevant witnesses and documents are very unlikely to be in the US.

*Second*, the cost to transport witnesses to trial weighs in favor of litigating in the UK given that it would be much less costly to transport Harker-Rigal and other UK-based witnesses to a court in the UK than to this Court in New York. *See id.* at 302; *see also Capital Currency Exch., N.V. v. Nat'l Westminster Bank PLC*, 155 F.3d 603, 611 (2d Cir. 1998) (concluding that the parties might be significantly burdened by a trial in the U.S. where "most of the witnesses in this case reside in England, and the cost of transporting these witnesses to New York could be enormous").

*Third*, the "availability of compulsory process for unwilling witnesses" weighs significantly in favor of litigating in the UK. *Banculescu*, 2012 WL 5909696, at *8. Because the witnesses reside in the UK, English courts could compel testimony from such witnesses, Craggs Decl. ¶ 71, and Kuberno US Inc. can agree to make available any U.S.-based witnesses. The same cannot be said should this case remain before this Court. For example, Rule 45(b) of the Federal Rules of Civil Procedure only allows for the service of a subpoena on a person located in the United States. Additionally, 28 U.S.C. § 1783 only allows for the service of a subpoena on a United States national or resident located abroad. The Court would thus lack the ability to compel testimony from witnesses who are UK citizens or residents, which this case would most likely require. *See Banculescu*, 2012 WL 5909696, at *8; *Allstate Life Ins. Co. v. Linter Grp. Ltd.*, 994 F.2d 996, 1001 (2d. Cir. 1993) (private factors favored dismissal where "key witnesses no longer

are within the subpoena power of the federal court and therefore cannot be compelled to appear at trial in New York"); *Strategic Value Master Fund, Ltd. v. Cargill Fin. Servs., Corp.*, 421 F. Supp. 2d 741, 768-69 (S.D.N.Y. 2006) (noting the fact that UK-based "nonparty witnesses are not subject to the Court's compulsory process weighs heavily in favor of dismissal") (collecting cases)).

*Finally*, other factors to consider include the "risk of inconsistent judgments" and the enforceability of a judgment rendered by this Court in England. *See Star Colbert*, 724 F. Supp. 3d at 334-36. In its 2024 letters to Kuberno Limited, DBL indicated that it may pursue certain claims under English law arising from Harker-Rigal's alleged breach of his employment agreement and Kuberno's alleged involvement with the purported breach. The fact that DBL could still bring such claims before an English court—which would be duplicative of Plaintiffs' claims before this Court—presents a risk of inconsistent judgments should this case proceed before the Court in parallel with an action in England. This scenario would also generate uncertainty over whether a judgment by this Court would be enforceable in England.

In sum, the private interests in this case do not favor maintaining this suit in New York.

2. *Public Interest Factors Also Favor Litigating in England.*

The public interest factors are: (1) the administrative difficulties associated with court congestion; (2) the unfairness of imposing jury duty on a community with no relation to the litigation; (3) the interest in having localized controversies decided at home; and (4) avoiding difficult problems in conflict of laws and the application of foreign law. *Aguinda v. Texaco, Inc.*, 303 F.3d 470, 480 (2d Cir. 2002).

*Factor 1*: Given that the Southern District of New York is one of the busiest districts in the United States, "'this Court has an interest in preventing unnecessary congestion of the court's docket.'" *Lazare Kaplan Int'l Inc.*, 337 F. Supp. 3d at 303 (quoting *BMR & Associates, LLP*, 92

F. Supp. 3d at 142)). The Court need not spend its time and resources adjudicating a dispute that belongs before an English court.

*Factor 2*: A New York jury should not be burdened with a dispute to which it has little to no local connection. Plaintiffs demand "a trial by jury on all claims so triable" under Rule 38 of the Federal Rules of Civil Procedure. Compl. at 25. The dispute at the core of this case is between a UK company and its former UK-based employee arising from alleged conduct occurring while he was working in the UK for another UK company. New York thus has an interest in avoiding the burden on its jurors of deciding "'cases that have no impact on their community.'" *Banculescu*, 2012 WL 5909696, at *8 (citation omitted).

*Factor 3:* The UK has a far greater interest in this litigation than does New York. "'[T]he public interest in having localized controversies decided at home' 'requires an evaluation of which forum possesses a stronger local interest in the controversy.'" *Star Colbert*, 724 F. Supp. 3d at 337 (citation omitted). As discussed above, the "'core events, operative facts, and associated private and institutional interests at issue are local to'" England, and English courts possess a stronger local interest in resolving the dispute between UK-based companies and a UK resident. *Id.* at 338 (noting that "'[a]ny tangential connection to New York this case may have does not come close to overriding the other relevant factors'" (citation omitted)).

*Factor 4*: Had DBL asserted breach of contract claims against Harker-Rigal and related claims against Kuberno Limited as DBL had threatened to do (via its 2024 letters), DBL and Harker-Rigal would have been subject "to the exclusive jurisdiction of the English courts" and the dispute would have been governed by the "laws of England." Harker-Rigal Decl. ¶ 10. Even without the breach of contract claims, this Court may still need to determine which jurisdiction's law should apply to this dispute given their clear lack of connection to New York. The need to

avoid unnecessary problems in conflicts of law or the application of foreign law further favors dismissal.

For the foregoing reasons, Defendants respectfully submit that this case should be dismissed in its entirety, with prejudice, on *forum non conveniens* grounds.

## II. <u>Plaintiffs Fail to State a Claim for Misappropriation of Trade Secrets.</u>

Should the Court choose to keep this case in the Southern District of New York, then the Court should dismiss Plaintiffs' misappropriation of trade secrets claims under the Defend Trade Secrets Act ("DTSA") and New York common law (Counts I and II) because Plaintiffs failed to plausibly allege that they possessed trade secrets. Under Rule 12(b)(6), the plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Here, Plaintiffs have not sufficiently pleaded the existence of a trade secret, which is an essential element of their trade secret misappropriation claims.

To prevail on its claim for trade secret misappropriation under the DTSA, a plaintiff must prove that "'(1) it possessed a trade secret, and (2) the defendant misappropriated the trade secret.'" *Democratic Nat'l Comm. v. Russian Fed.*, 392 F. Supp. 3d 410, 447 (S.D.N.Y. 2019) (citations omitted). The DTSA defines "trade secret" to include "all forms and types of financial, business, scientific, technical, economic, or engineering information . . . " so long as: (1) "*the owner thereof has taken reasonable measures to keep such information secret*" and (2) "the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information." 18 U.S.C. § 1839(3) (emphasis added). "The elements required to prove a violation of the DTSA and trade secret misappropriation under New York common law are 'fundamentally the same,' and '[d]istrict courts often rely on cases discussing misappropriation under New York law to analyze DTSA claims.'" *Negative, Inc. v.*

*McNamara*, 770 F. Supp. 3d 472, 479 (E.D.N.Y. 2025) (quoting *Iacovacci v. Brevet Holdings, LLC*, 437 F. Supp. 3d 367, 380 (S.D.N.Y. 2020)).

Under the DTSA and New York common law, "[t]he 'most important consideration' in determining whether information is a trade secret is 'whether the information was secret.'" *See Zabit v. Brandometry, LLC*, 540 F. Supp. 3d 412, 421-22 (S.D.N.Y. 2021) (quoting *Broker Genius, Inc. v. Zalta*, 280 F. Supp. 3d 495, 514 (S.D.N.Y. 2017)); *Lehman v. Dow Jones & Co., Inc.*, 783 F.2d 285, 298 (2d Cir. 1986). "Accordingly, in order to successfully state a claim for trade secret misappropriation, 'courts require that the [plaintiff] possessor of a trade secret take reasonable measures to protect its secrecy.'" *Pauwels v. Deloitte LLP*, 83 F.4th 171, 181 (2d Cir. 2023) (alteration in original) (quoting *Defiance Button Mach. Co. v. C & C Metal Prods. Corp.*, 759 F.2d 1053, 1063 (2d Cir. 1985)).

Even accepting as true the allegations in the Complaint for purposes of a motion to dismiss, Plaintiffs acknowledge that Harker-Rigal was still able to use his Diligent login credentials to access the Demo Site for approximately two years after he left the company. Compl. ¶ 54. The fact that Harker-Rigal was able to freely access the Demo Site for two years after he left DBL is particularly inexplicable given that Plaintiffs now assert that the Demo Site stores DBL's trade secrets. Plaintiffs thus failed to take the most basic and simple measure—disabling Harker-Rigal's login credentials after he left the company—to safeguard DBL's purported trade secrets. Regardless of whether DBL's failure to remove Harker-Rigal's access to the Demo Site was intentional or not, DBL clearly did not take reasonable measures to protect its alleged trade secrets. *Pauwels*, 83 F.4th at 181.

The Southern District of New York recently dismissed a trade secrets claim under the DTSA where, as here, "Plaintiffs' own allegations in the [] Complaint make plain that they failed

to take reasonable measures to protect the secrecy of the [alleged trade secrets]. This is fatal to their claim." *Zabit*, 540 F. Supp. 3d at 424. The fact that the alleged trade secrets were subject to confidentiality and non-disclosure agreements did not excuse Plaintiffs from still having to safeguard the information. In dismissing the DTSA claim on a motion to dismiss, the court held that the confidentiality "agreements at issue here are insufficient when considered in light of the facts acknowledged by Plaintiffs, which reflect a failure to take reasonable measures to guard any secrecy" as to the alleged trade secrets. *Id.* at 425.

The same reasoning should apply to this case. Plaintiffs' claim that they took "reasonable steps to ensure the confidentiality of its trade secrets" including through the use of confidentiality agreements, Compl. ¶¶ 69 & 83, is belied by the fact that their own pleading acknowledges that the information contained in the Demo Site remained readily accessible to Harker-Rigal, Compl. ¶¶ 47 & 54. Therefore, as a matter of law, Plaintiffs' failure to take reasonable measures to protect their purported trade secrets is fatal to Plaintiffs' purported trade secret claims. *See Zabit*, 540 F. Supp. 3d at 424. Accordingly, dismissal, with prejudice, of Plaintiffs' purported misappropriation of trade secrets claims under the DTSA and New York common law is warranted.

## CONCLUSION

For the reasons set forth above, Defendants Kuberno Limited and Kuberno US Inc. respectfully request that the Court dismiss Plaintiffs' Complaint with prejudice.

Dated: June 27, 2025

Respectfully submitted,

COVINGTON & BURLING LLP

By: *__/s/ Evan Parness__*
Evan Parness

The New York Times Building
620 Eighth Avenue
New York, NY 10018-1405
(212) 841-1000
EParness@cov.com

Teresa Lewi
One CityCenter
850 10th Street, NW
Washington, DC 20001-4956
(202) 662-6000
tlewi@cov.com

*Counsel for Defendants*
*Kuberno Limited and Kuberno US Inc.*